# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                                          Case No. 6:20-cr-163-RBD-GJK

FREEDIE LEE WILLIS

## ORDER

Defendant Freedie Lee Willis moved to suppress statements and evidence from an August 19, 2020 traffic stop. (Doc. 36 ("**Motion**").) The Government responded and the Court held a hearing. (Docs. 39–40.) At the hearing, the Court denied the Motion. (*See* Doc. 40.) This Order memorializes the Court's oral pronouncements.

### I.   BACKGROUND

Best to begin at the beginning. And here the story starts about a month before Willis' traffic stop.

Sometime in July or August 2020, the Brevard County Sherriff's Office ("**BCSO**") received a citizen complaint about suspected drug activity: reportedly a black jeep was coming and going from a residence in the City of Rockledge at all hours of the day, staying only for a short period each time. (*See* Doc. 42-3, p. 2; *see*

-1-

*also* Doc. 40.[1]) BCSO Agents Taylor Barrett and Benjamin Brown, among others, were assigned to investigate. (*See* Doc. 42-3, p. 2; *see also* Doc. 40.[2]) At first they surveilled the residence, but their focus soon shifted to the black jeep. (*See* Doc. 42-3, p. 2; *see also* Doc. 40.[3])

On August 10, 2020, Agents Barrett and Brown followed the black jeep from the residence to a convenience store in Cocoa, Florida known for drug transactions in the parking lot. (Doc. 40.[4]) A silver jeep parked in the same lot. (*Id.*;[5] Doc. 42-3, p. 2.) The driver of the black jeep got out of his vehicle, walked over to the silver jeep's driver-side door, and conducted a hand-to-hand transaction with the silver jeep's driver. (Doc. 42-3, p. 3; *see also* Doc. 40.[6]) Based on his training and experience, and what he knew about the jeep and location, Agent Barrett concluded he had witnessed a drug transaction. (Doc. 40.[7])

Nine days later, events seemed to repeat. The black jeep left the residence to

---

[1] As of the signing of this Order, an official transcript of the hearing is not available, but the Court summarizes the relevant testimony. Where helpful, the Court notes the identity of the witness that testified on the matter. The Court found all witness testimony recounted in this section to be credible, unless otherwise noted.

[2] Agent Barrett's testimony.

[3] Agent Barrett's testimony.

[4] Agent Barrett's testimony.

[5] Agent Barrett's testimony.

[6] Agent Barrett's testimony.

[7] Agent Barrett's testimony.

drive to a gas station. (Doc. 40.[8]) The same silver jeep from August 10th appeared, parking near the black jeep. (Doc. 42-3, p. 2; *see also* Doc. 40.[9]) Later, BCSO agents would determine the silver jeep was driven by Willis. (Doc. 42-3, pp. 2–3; *see also* Doc. 40.[10]) At around 12:07 p.m., Willis got out of his silver jeep and walked to its passenger door, opened it, and there met with the driver of the black jeep. (Doc. 42-3, p. 2; *see also* Doc. 40.[11]) The meeting lasted no more than ten seconds. (Doc. 42-3, p. 2; *see also* Doc. 40.[12]) Agent Barrett witnessed the encounter and believed it was a drug transaction. (Doc. 40.[13]) Agent Brown, who was also at the gas station, saw part of the transaction as well. (Doc. 42-3, p. 2; *see also* Doc. 40.[14])

The black jeep then left the area and the BCSO decided to follow the silver jeep that had twice now appeared in their investigation. (Doc. 40.[15]) Agents watched as Willis briefly entered the gas station before exiting to speak with another driver in the parking lot. (Doc. 42-3, p. 2.) As this was happening, one

---

[8] Agents Barrett's and Brown's testimony.
[9] Agents Barrett's and Brown's testimony.
[10] Agents Barrett's and Brown's testimony.
[11] Agent Barrett's testimony.
[12] Agent Barrett's testimony.
[13] Agent Barrett's testimony.
[14] Agent Brown's testimony. From his testimony at the hearing, it is unclear how much of the transaction he witnessed versus how much was relayed to him by Agent Barrett. But all the agents who testified indicated there was constant communication among the group of agents at the gas station that day.
[15] Agent Barrett's testimony.

agent got the license plate number for the silver jeep—a run of the number revealed the car was registered to Willis. (Doc. 42-3, p. 2; *see also* Doc. 40.[16]) Agent Craig Adelman, on scene, told his colleagues he was familiar with Willis—Willis, nicknamed "the Black Russian," was a long-time suspected drug trafficker that had been under investigation by the BCSO for years. (Doc. 42-3, pp. 2–3; *see also* Doc. 40.[17])

Willis left the gas station and the agents followed. (Doc. 42-3, p. 3; *see also* Doc. 40.[18]) Soon after, Agent Brown saw Willis cross over a solid white line while changing lanes through an intersection. (Doc. 42-3, p. 3; *see also* Doc. 40.[19]) When Willis changed lanes, the car driving behind him had to slow down. (Doc. 42-3, p. 3; *see also* Doc. 40.[20]) So Agent Brown pulled Willis over at 12:17 p.m. for what he believed was an improper lane change. (Doc. 42-1, p. 2; *see also* Doc. 40.[21]) Agent Barrett, who had been following close behind, and Agent Mitchell Mattias, assisted with the stop. (Doc. 42-4, pp. 2–3; *see also* Doc. 40.[22])

After stopping, Agent Brown approached Willis, collected his driver's

---

[16] Agent Barrett's testimony.
[17] Agents Barrett's, Brown's, and Adelman's testimony.
[18] Agent Barrett's testimony.
[19] Agent Brown's testimony.
[20] Agent Brown's testimony.
[21] Agents Brown's, Barrett's, and Matthias' testimony.
[22] Agents Barrett's and Mathias' testimony.

license, and began running a license and warrants check and writing up a written warning for a lane change violation. (Doc. 42-3, p. 3; *see also* Doc. 40.[23]) As Agent Brown collected Willis' documents, Agent Matthias walked to the jeep's passenger side door and, after verifying Willis was the sole occupant, at 12:20 p.m. radioed for a K9 unit to come to the scene. (Doc. 42-1, p. 2; Doc. 42-4, p. 3; *see also* Doc. 40.[24])

As he was writing the warning, Agent Brown noted the time as "12:31" and used a "cheat sheet" of Florida traffic statutes, describing the offense as: "Improper lane change (solid line) 316.0765." (Doc. 41-7; *see also* Doc. 40.[25]) Meanwhile, Agent Mathias spoke to Willis, who had remained in his vehicle. (Doc. 42-4, p. 3; *see also* Doc. 40.[26]) From his vantage point near the passenger side door, Agent Matthias noticed a large quantity of cash sitting in the cupholder and a window tint violation on Willis' car: the sunscreen layer at the top of the windshield extended below the AS1 line sticker. (Doc. 42-3, p. 3; *see also* Doc. 40;[27] Doc. 41-5.)

As Agent Brown was finishing the written warning, Deputy Adam Steuerwald arrived on the scene with his canine narcotics detection partner,

---

[23] Agent Brown's testimony.
[24] Agent Matthias' testimony.
[25] Agent Brown's testimony.
[26] Agent Mathias' testimony.
[27] Agent Mathias' testimony.

Waylon, at 12:37 p.m. (Doc. 42-1, p. 2; Doc. 42-3, p. 3; *see also* Doc. 40.[28]) Deputy Steuerwald's police dash cam shows Agent Brown writing what looks to be a citation on the roof of his car as he pulls up, corroborating Deputy Steuerwald's and Agent Brown's testimony.[29] (*See* Doc. 41-1; *cf.* Doc. 40;[30] Doc. 42-3, p. 3.)

Waylon conducted a free air sniff of Willis' car and alerted. (Doc. 42-2; *see also* Doc. 40.[31]) Agents then searched the car and found a large quantity of drugs and cash. (Doc. 42-3, pp. 3–4; *see also* Doc. 40.[32]) Willis was later indicted for possession with intent to distribute fentanyl and cocaine. (Doc. 17.)

Willis now moves to suppress the evidence from the traffic stop for Fourth Amendment violations.[33] (Doc. 36.) With the Government's response and a hearing, the matter is ripe. (Docs. 39–40.)

## II.   ANALYSIS

"As a general rule, the evidence gathered as a result of an unconstitutional stop must be suppressed." *United States v. Chanthasouxat*, 342 F.3d 1271, 1280 (11th Cir. 2003) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963)). And on a

---

[28] Agent Brown's and Deputy Steuerwald's testimony.
[29] The unmarked patrol cars driven by the undercover agents are not equipped with dash cams. (*See* Doc. 40 (Agent Barrett's testimony).)
[30] Deputy Steuerwald's and Agent Brown's testimony.
[31] Deputy Steuerwald's testimony.
[32] Agents Brown's and Matthias' and Deputy Steuerwald's testimony.
[33] The Motion was drafted without the benefit of Deputy Steuerwald's dash cam video, but counsel had the opportunity to review the footage before the hearing.

motion to suppress evidence from a warrantless search and seizure, the Government bears the burden to show the search was reasonable. *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983). The Government met its burden to show this stop was constitutional. While the traffic violation pretextual stop was not without problems, the agents had reasonable, articulable, particularized suspicion to conduct a short stop—so there was no constitutional violation.

A traffic stop is constitutional "if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with *Terry*." *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008) (referring to *Terry v. Ohio*, 392 U.S. 1 (1968)). For the first option (the traffic violation), Agent Brown claims he pulled Willis over for improperly changing lanes, crossing over a solid line, and changing lanes within 100 feet of an intersection. (*See* Doc. 41-7; Doc. 42-3, p. 3; *see also* Doc. 40.[34]) But what Florida traffic statute did this violate?

At the close of the hearing, the Government conceded the statute referenced in the written warning could not serve as the basis for the stop: Florida Statute § 316.0765 essentially forbids running a red light, which Agent Brown did not

---

[34] Agent Brown's testimony.

observe. (*See* Doc. 41-7; *see also* Doc. 40.[35]) Instead, the Government claimed Agent Brown witnessed Willis violate § 316.089, which governs lane changes. *See* Fla. Stat. § 316.089; (Doc. 40[36]). But contrary to Agent Barrett's and the Government's assertions, this statute, too, does not forbid changing lanes within 100 feet of an intersection or crossing a single solid white line.[37] *See* Fla. Stat. § 316.089; (*cf.* Doc. 40[38]). And while § 316.089 forbids drivers from changing lanes "until the driver has first ascertained that such movement can be made with safety," nothing about Agent Brown's testimony or supplemental report indicates he observed unsafe behavior—he simply noted a following car had to slow down a bit after Willis changed lanes. (Doc. 42-3, p. 3; Doc. 40.[39]) So the Government has not met its

---

[35] Representations by Government counsel and the testimony of Agent Brown.

[36] Argument of Government counsel.

[37] In testimony, Agent Barrett asserted it is illegal to cross over a solid white line or to change lanes within 100 feet of an intersection—although he could not recall the particular Florida statute. The Florida Department of Transportation has adopted the Federal Highway Administration's Manual on Uniform Traffic Control Devices ("**MUTCD**") to "provide a uniform system of traffic signs and signals." Fla. Dept. of Transp., *Pavement Marking*, https://www.fdot.gov/traffic/TrafficServices/Pavement-Marking.shtm (last accessed Mar. 3, 2021). The MUTCD says "where crossing the lane line markings is *discouraged*, the lane line markings shall consist of a normal or wide solid white line." MUTCD, p. 362, ¶ 20 (emphasis added) (accessible at https://mutcd.fhwa.dot.gov/pdfs/2009r1r2/pdf_index.htm). On the other hand, "Where crossing the lane line markings is *prohibited*, the lane line markings shall consist of a solid *double* white line." MUTCD, p. 370, ¶ 30 (emphasis added). So despite what common sense (and driver's education teachers) may tell you, the Government has not shown that crossing a single solid white line is prohibited or a violation of Florida Statute § 316.089. And while Agent Barrett is correct that drivers may not cross the centerline of a road within 100 feet of an intersection, Florida statute § 316.089 makes no reference to this—nor does § 316.087, which references centerlines only and does not cover lane changes.

[38] Agent Brown's testimony.

[39] Agent Brown's testimony.

burden to show Agent Brown had probable cause to believe a traffic violation occurred.[40, 41]

The analysis does not end there, however, because there is another way officers can stop suspects: if they have "reasonable suspicion" of criminal activity for a *Terry* stop. *Harris*, 526 F.3d at 1337; *see also Terry*, 392 U.S. 1. And Agent Brown did.

Police may conduct a "brief investigatory stop" if "they have a reasonable, articulable suspicion based on objective facts that an individual is engaged in criminal activity." *Harris*, 526 F.3d at 1337 (internal quotation marks omitted). This

---

[40] As to the window tint violation: the Government did not directly address this when arguing there was probable cause for a traffic violation stop, but the Court also notes it is unclear whether Agent Brown was aware of the window tint violation before stopping Willis. The window tint violation is not referenced in the written warning or his supplemental report. (*See* Docs. 41-7, 42-3.) And while Agent Brown testified he was "made aware" of the window tint violation at some point, he didn't recall how or when he learned of it—only that another agent told him. (Doc. 40 (Agent Brown's testimony).) Agent Matthias personally observed the window tint while speaking to Willis, but he had not noticed it while driving, noting he needed to be close to observe it. (Doc. 40 (Agent Matthias' testimony).) This makes sense because recognizing the violation requires comparing the depth of the sunscreen bar at the top of the windshield to a small marking, the AS1 bar, along the windshield. (*See* Doc. 41-5; Doc. 40 (Agent Matthias' testimony).) Agent Weimer also claims to have seen the window tint violation, but it is unclear if this was communicated to Agent Brown before the stop. (*See* Doc. 40 (Agents Weimer and Brown's testimony).) So the Government has not shown Agent Brown knew of the window tint violation prior to stopping Willis and so had probable cause prior to the stop. *See Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019).

[41] Finally, the Court acknowledges that an officer's "reasonable mistake of law" does not negate probable cause for a traffic stop. *See Heien v. North Carolina*, 574 U.S. 54, 60–61 (2014); *see also United States v. Scott*, 693 F. App'x 835, 836–87 (11th Cir. 2017). But the Government did not argue, much less show, Agent Brown's interpretation of § 316.089 was reasonable albeit mistaken—and the statute clearly refers to "safety" as the barrier to changing lanes, not speed changes of nearby cars. *See* Fla. Stat. § 316.089. So there was no probable cause to stop Willis for a traffic violation, even considering reasonable mistake.

determination is based on a totality of the circumstances and reasonable suspicion may be formed "by observing exclusively legal activity." *Id.* at 1337–38. But reasonable suspicion "requires some minimal level of objective justification for making the stop"; the officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (cleaned up).

Agent Brown, along with other BCSO agents, had been surveilling the black jeep for weeks in response to a citizen's complaint about suspicious activity. (Doc. 42-3, p. 2; *see also* Doc. 40.[42]) Just nine days prior to the stop of Willis, agents had witnessed a hand-to-hand transaction between the driver of the black jeep and the silver jeep Willis was driving, at a location known for drug dealing. (Doc. 42-3, p. 2; *see also* Doc. 40.[43]) And just minutes before Willis was pulled over, agents observed Willis pull into a parking lot and meet for less than ten seconds with the driver of the black jeep at Willis' open passenger door, in what looked like a drug transaction, and Agent Adelson recognized the name Freedie Willis as associated with the drug trade, having been investigated by the BCSO for years. (Doc. 42-3, p. 2; *see also* Doc. 40.[44]) All of this was communicated amongst the agents as it

---

[42] Agents Brown's and Barrett's testimony.
[43] Agents Brown's and Barrett's testimony.
[44] Agents Brown's, Barrett's, and Adelson's testimony.

happened. (Doc. 42-3, p. 2; *see also* Doc. 40.[45]) Given the totality of the circumstances, Agent Brown had reasonable, articulable, particularized suspicion of criminal activity when he stopped Willis on August 19, 2020. *See United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1220–21 (11th Cir. 1993); *United States v. Smith*, No. 1:16-CR-006-11-ELR-AJB, 2016 WL 7856415, *5–7 (N.D. Ga. Dec. 28, 2016), *adopted by* 2017 WL 218413 (N.D. Ga. Jan 18, 2017).

And the duration and scope of the stop was also reasonable. "In assessing whether a detention is too long in duration to be justified as an investigative stop," courts examine "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). There are four non-exclusive factors courts consider: (1) the law enforcement purposes served by the detention; (2) the diligence with which the police pursue the investigation; (3) the scope and intrusiveness of the detention; and (4) and duration of the detention. *United States v. Acosta*, 363 F.3d 1141, 1146 (11th Cir. 2004). "There is no rigid time limitation or bright line rule regarding the permissible duration of a *Terry* stop"—instead, courts should use their common sense. *Id.* at 1146–47; *see also United States v. Place*, 462 U.S. 696, 709-10 (1983).

---

[45] Testimony of Agents Brown, Barrett, and Adelson.

The evidence shows the agents diligently pursued their investigation after stopping Willis. Agent Matthias called for a K-9 unit less than four minutes after Willis was stopped, after ascertaining Willis was the only occupant of the silver jeep and seeing the cash in the cupholder. (Doc. 42-1, p. 2; *see also* Doc. 40;[46] Doc. 42-3, pp. 2–3.) Deputy Steuerwald arrived at the scene just 17 minutes later, at 12:37 p.m.—so all told Willis' *Terry* stop lasted for only around 20 minutes, during which time he was detained in his car. (*See* Docs. 42-1, 40;[47] Doc. 41-1; Doc. 42-3, p. 3.) Given the circumstances, briefly detaining Willis to wait for Waylon's arrival was reasonable—there was no Fourth Amendment violation. *See Smith*, 2016 WL 7856415, at *6–7. So Willis' Motion is denied.

### III.   CONCLUSION

It is **ORDERED AND ADJUDGED** that Defendant Freedie Lee Willis' Motion to Suppress Statements and Evidence (Doc. 36) is **DENIED.**

**DONE AND ORDERED** in Chambers in Orlando, Florida, on March 4, 2021.

---

[46] Testimony of Agent Matthias.
[47] Testimony of Deputy Steuerwald.



ROY B. DALTON JR.
United States District Judge